1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

11

KELLY K. K.,[1]

Case No.  CV 17-08124-RAO

12

Plaintiff,

13

v.

**MEMORANDUM OPINION AND ORDER**

14

NANCY A. BERRYHILL, Deputy
Commissioner of Operations of Social
Security,

15

16

Defendant.

17

18

19

I.      **INTRODUCTION**

20

Plaintiff Kelly K. K. ("Plaintiff") challenges the Commissioner's denial of

21

her application for a period of disability and disability insurance benefits ("DIB").

22

For the reasons stated below, the decision of the Commissioner is AFFIRMED.

23

II.     **PROCEEDINGS BELOW**

24

On March 6, 2014, Plaintiff protectively applied for DIB alleging disability

25

beginning May 20, 2008.  (Administrative Record ("AR") 78, 90.)  Her application

26

27

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B)
and the recommendation of the Committee on Court Administration and Case
Management of the Judicial Conference of the United States.

28

was denied initially on July 25, 2014. (AR 91.) Plaintiff filed a written request for hearing, and a hearing was held on May 6, 2016. (AR 43, 96.) Represented by counsel, Plaintiff appeared and testified, along with an impartial vocational expert ("VE"). (AR 45-77.) On May 26, 2016, the Administrative Law Judge ("ALJ") found that Plaintiff had not been under a disability, pursuant to the Social Security Act,[2] from May 20, 2008 through September 30, 2014, the date last insured. (AR 36.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. (AR 1.) Plaintiff filed this action on November 7, 2017. (Dkt. No. 1.)

The ALJ followed a five-step sequential evaluation process to assess whether Plaintiff was disabled under the Social Security Act. *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995). At **step one**, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 20, 2008, the alleged onset date ("AOD"), through September 30, 2014, her date last insured. (AR 26.) At **step two**, the ALJ found that Plaintiff's asthma and plantar fasciitis were severe impairments. (*Id.*) At **step three**, the ALJ found that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (AR 29.)

Before proceeding to step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to:

> [P]erform light work . . . : the claimant can lift or carry 20 pounds occasionally and 10 pounds frequently; and sit, stand, or walk for 6 hours in an 8-hour workday with normal breaks. The claimant cannot have concentrated exposure to pulmonary irritants, dust, odors, or fumes; can occasionally climb stairs, ramps, ladders, ropes, and scaffolds; and can occasionally balance, stoop, kneel, and crouch.

---

[2] Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment expected to result in death, or which has lasted or is expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A).

(*Id.*)  At **step four**, the ALJ found that Plaintiff was capable of performing past relevant work as a construction superintendent, and thus the ALJ did not continue to step five.  (AR 35-36.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability from the AOD through the date last insured.  (AR 36.)

## III.  <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  A court must affirm an ALJ's findings of fact if they are supported by substantial evidence and if the proper legal standards were applied.  *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001).  "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).  An ALJ can satisfy the substantial evidence requirement "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted).

"[T]he Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence.  Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion."  *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001) (citations and internal quotation marks omitted).  "'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)); *see Robbins*, 466 F.3d at 882 ("If the evidence can support either affirming or reversing the ALJ's conclusion, we may not substitute our judgment for that of the ALJ.").  The Court may review only "the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."  *Orn v.*

*Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

**IV.** **DISCUSSION**

Plaintiff raises the following issues for review: (1) whether the ALJ failed to adequately develop the record at step four; (2) whether the ALJ improperly weighed medical opinions and rejected evidence; and (3) whether the ALJ erred in her adverse credibility finding. (*See* Joint Stipulation ("JS") 3-4.) For the reasons below, the Court affirms.

**A.** **The ALJ Was Not Required to Resolve a Conflict at Step Four**

Plaintiff contends that the ALJ failed to fully develop the record regarding a construction superintendent's exposure to irritants at a construction site. (*See* JS 4-8, 12-13.) The Commissioner contends that the ALJ had no duty to resolve any conflict because the Dictionary of Occupational Titles ("DOT") is consistent with the VE's testimony. (*See* JS 9-11.)

**1.** **Applicable Legal Standard**

"[T]he Social Security Administration relies primarily on the Dictionary of Occupational Titles for 'information about the requirements of work in the national economy,'" and a VE's testimony generally should be consistent with it. *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007) (quoting Soc. Sec. Reg. 00-4p, 2000 WL 1898704 at *2 (S.S.A. Dec. 4, 2000)). The ALJ may not rely on the VE's testimony regarding the requirements of a particular job without first inquiring whether the testimony conflicts with the DOT. *Massachi*, 486 F.3d at 1152.

When there is a conflict between the DOT and the VE's testimony, neither automatically prevails over the other. *Id*. at 1153. The ALJ must determine whether a conflict exists and, if so, determine whether the VE's explanation for the conflict is reasonable and whether there is a basis for relying on the VE rather than the DOT. *Id.* This includes information in the DOT's companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of

4

Occupational Titles ("SCO"), published by the Department of Labor. *See* Soc. Sec. Reg. 00-4p, at *1.

The ALJ need only follow up on conflicts that are "apparent or obvious," involving "job requirements that are essential, integral, or expected." *Gutierrez v. Colvin*, 844 F.3d 804, 807-08 (9th Cir. 2016); *see Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015) ("When there is an apparent conflict between the vocational expert's testimony and the DOT—for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle—the ALJ is required to reconcile the inconsistency.").

### 2. Discussion

At the hearing, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience with the following limitations:

> [L]imited to occasionally carrying 20 pounds/frequently 10 pounds; who could lift the same—lift and carry the same amount; who could sit, stand, and walk for six hours in an eight-hour day taking normal breaks; who could not have concentrated exposure to dusts, odors, fumes, and pulmonary irritants.

(AR 73.) The VE testified that such an individual could perform Plaintiff's past relevant work. (*Id.*) The ALJ then added to the hypothetical:

> [S]he could only occasionally climb ramps or stairs and ladders, ropes, and scaffolds; she could balance, stoop, kneel, crouch, and crawl occasionally . . . .

(*Id.*) The VE stated that the additional limitations would not change his answer. (*Id.*) The VE also testified that his testimony was consistent with the DOT, but he augmented his testimony based on his professional knowledge and experience. (AR 74.)

When examined by Plaintiff's attorney, the VE testified that when performing Plaintiff's past relevant work, a worker "[w]ould not be exposed to concentrated [dust, smoke, and fumes], but would be exposed to dust outside like

weather conditions." (*Id.*) The VE explained that "[b]y the nature of being outside, there's going to be exposure to dust." (AR 74-75.) Plaintiff's attorney further inquired, "But isn't there more on a construction site than just on an outside basis?" (AR 75.) The VE responded, "Not to the point that it's concentrated." (*Id.*) The VE explained that "even looking at the environment, there is exposure to weather," and "[u]sually as you get into more concentrated dust, odor, fumes, it's the—it brings into play under the environment atmospheric conditions." (*Id.*) The VE also confirmed that there is no climbing required according to the DOT. (*Id.*) When asked about his personal observations, the VE stated that climbing could be necessary "on a basically infrequent non-predicted basis." (AR 776.)

The ALJ determined that the VE's testimony was consistent with the information in the DOT, and therefore the ALJ found that Plaintiff was capable of performing her past relevant work. (AR 36.)

Plaintiff contends that, while the VE was being questioned by Plaintiff's counsel, the VE "was unclear as to the nature of exposure to irritants on a construction site, and as to the definition of 'concentrated' exposure." (JS 5.) Plaintiff asserts that the VE "attempted, but failed, to clarify that he meant the exposure was due to being outside, as opposed to on a construction site, whether inside or outside." (*Id.*) Plaintiff states that the ALJ did not take any steps to resolve the issue with the VE's testimony. (JS 6.) Plaintiff also contends that the ALJ failed to "follow up with the VE on the requirement that a construction manager be able to climb ramps, stairs, ladders, and scaffolds more than 'occasionally.'" (*Id.*)

Plaintiff relies on *Lamear v. Berryhill*, 865 F.3d 1201 (9th Cir. 2017), to illustrate the ALJ's duty to resolve conflicts. (*See* JS 7-8.) There, a claimant was limited to "occasional" handling, fingering, and reaching with his left hand and arm; his right hand and arm had no limitations. *Lamear*, 865 F.3d at 1203. The ALJ opined that the claimant could perform occupations that, according to the

DOT, required "frequent" handling, fingering, and reaching. *Id.* The VE did not explain how the claimant could perform this work that exceeded his left hand and arm limitations, nor did the ALJ ask the VE to reconcile the inconsistency. *Id.* at 1204. The court observed that the DOT's descriptions strongly suggested that the use of both hands would be necessary to perform "essential, integral, or expected" tasks. *Id.* at 1205. The court therefore reversed and remanded, finding that it was not likely and foreseeable that someone with Plaintiff's left-side limitations could perform the identified occupations that required "frequent" handling, fingering, and reaching. *Id.* at 1205-06.

Here, by contrast, the DOT's functional requirements are consistent with Plaintiff's RFC and the VE's testimony about her ability to perform the occupation of construction superintendent. Plaintiff cites the Occupational Information Network to support her contention that construction managers are exposed to pulmonary irritants and are required to balance. (JS 6.) But the Social Security Administration relies primarily on the DOT and SCO for information about the requirements of work. *See* Soc. Sec. Reg. 00-4p, at *1. Plaintiff also incorrectly asserts that the DOT "does not state specifically how much exposure to dusts and fumes exist on [construction] sites." (JS 7.) In fact, the occupation of construction superintendent identifies atmospheric conditions[3] as "Not Present – Activity or condition does not exist." DICOT 182.167-026, 1991 WL 671167. Climbing is also not required. *Id.* The VE did identify some exposure to dust, but when asked if it was more than "just on an outside basis" on a construction site, the VE explained that it would not be concentrated exposure. (*See* AR 74-75.) The VE also testified that based on his personal observations, there "could be . . . infrequent non-predicted" climbing. (AR 76.) These additional explanations are consistent

---

[3] The SCO defines "atmospheric conditions" as "[e]xposure to such conditions as fumes, noxious odors, dusts, mists, gases, and poor ventilation, that affect the respiratory system, eyes, or the skin." Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix D (1993).

with the RFC and the VE's prior testimony about no concentrated exposure to irritants and occasional climbing. (*See* AR 73.)

Because there was no apparent or obvious conflict between the DOT's listing and the VE's testimony, the ALJ was not required to follow up to resolve any conflict. *See Gutierrez*, 844 F.3d at 807-08; *Zavalin*, 778 F.3d at 846.

## B. <u>The ALJ's Credibility Determination is Supported by Substantial Evidence</u>

Plaintiff argues that the ALJ improperly rejected her subjective symptom testimony. (*See* JS 26-28.) The Commissioner argues that the ALJ provided legally adequate reasons for discounting Plaintiff's testimony. (*See* JS 28-31.)

### 1. Plaintiff's Testimony

At the hearing, Plaintiff stated that she had a master's degree in business and real estate. (AR 48.) Plaintiff previously worked as a construction manager, monitoring and managing projects. (AR 49-50.) She was on her feet a lot when performing inspections of units. (AR 61.) Plaintiff agreed that she was exposed to dust, smoke, or fumes, and she explained that at one site inspection, "it almost smell[ed] like someone die[d] in there." (*Id.*) Plaintiff was also exposed to cold and had to climb ladders. (AR 61-62.)

Plaintiff testified that she had problems with her eyes, a chronic cough, and fatigue related to her work in a trailer. (*See* AR 51-52.) Plaintiff's conditions began when she was moved to the trailer in March 2008; she did not have any problems when she worked at her prior office. (*See* AR 52.) Plaintiff stopped working due to her doctor's orders, and she testified that she got better in a few years once she was away from that work environment. (*Id.*) Plaintiff asserted that her chronic cough "was so bad [she] thought [she] was dying." (*Id.*) She explained that there were toxins in the trailer, as well as pest control spray and cleaning solutions that she smelled. (AR 53.) Plaintiff complained about the lack of windows in the trailer, and she had colleagues complain to Cal OSHA on her

behalf. (*Id.*) Plaintiff stated that by that time, "it was too late" because she had already gotten sick and could no longer be in the trailer. (*Id.*) Plaintiff testified that when she stopped working and stayed home, away from that environment, she slowly got better. (*Id.*) Plaintiff liked her job and did not want to leave it, but she "had no choice." (AR 53-54; *see* AR 55.) When asked if she would have been able to work in her old office, Plaintiff explained that she had wanted to, but she was denied. (AR 54.) Plaintiff could have performed a "sit-down job," but nothing that involved going to a construction site. (*See id.*) She had hoped to get her job back in a few years. (AR 55.) Plaintiff contacted her employer at the beginning of every year, but they told her no. (*Id.*) Plaintiff also stated that they had gotten rid of the whole department. (*Id.*)

Plaintiff asserted that she cannot work at any job because she does not have any skills besides "doing monitors and telephone." (AR 55.) Plaintiff explained that she applies to jobs, but no one has hired her. (*Id.*) She stated that she thinks that her age is one reason why she is not hired. (*Id.*)

Plaintiff testified that she is "not the same" after developing her condition. (AR 54.) Within the past few years, Plaintiff's feet have also begun hurting, and she cannot stand for very long. (*Id.*)

On a daily basis, Plaintiff watches television, reads, eats, and sometimes goes out. (AR 56; *see* AR 64.) Plaintiff goes grocery shopping, takes care of "health/personal care stuff," goes to her temple "at least on[c]e or twice a week and sometimes more," and goes to gatherings at her temple about once a month. (AR 56.) She also reads books at her temple's library, talks to friends on the phone, and uses computers. (*Id.*) After eating or while watching television, Plaintiff lies down. (AR 65.) She stated that she feels tired and fatigued, so she lies down "a lot," about 4 or 5 times per day for 10 to 30 minutes at a time. (*See id.*) Sometimes she rests her eyes and does not really sleep. (*Id.*) Afterward, she feels more energetic and can concentrate more. (*Id.*)

Plaintiff does "feet exercise[s]," such as rotating her ankle, because her feet hurt if she doesn't do them. (AR 56.)  Her doctor told her to do the exercises on a daily basis. (*Id.*)  Plaintiff wears arch supports for both feet. (*Id.*)  Her right foot "feels better" after more exercises and arch support, but Plaintiff is "very careful" with her left foot. (*Id.*)  If her left foot gets hurt, it hurts her for over a week. (*Id.*)  Plaintiff testified that because she has control of her activities, "even though it hurts a little bit now, it's not as bad." (*Id.*)  She estimated that she hurts her foot about once every one to two months. (*See* AR 56-57.)  When her foot starts hurting, she needs to take care of it right away, and if she does not "sit down or walk around, it gets very hurt and then it will take a long time to—to get back to comfortable" so she can stand again. (AR 57.)  Plaintiff described the pain as a sharp pain in her heel. (AR 63.)  She estimated that she can stand for about five to ten minutes before her foot starts hurting. (AR 64; *see* AR 68.)  Plaintiff can walk for half an hour to an hour at a time. (AR 69.)  She cannot climb ladders or scaffolding because she will lose her balance. (*Id.*)

Plaintiff no longer does her martial arts training because "after [she] got sick [she] couldn't do anything." (AR 57.)  She had wanted to resume her training after she got sick, but her feet started hurting. (*Id.*)

Plaintiff stated that she had been getting temporary workers' compensation disability, but then she got her permanent disability paid in one lump sum. (*See* AR 59-60.)

Plaintiff testified that during the hearing, her energy level was "good" because she had gotten a lot of rest. (AR 62.)  In general, Plaintiff has good days and bad days. (AR 63.)  She tries to go out when she needs to, which is at maximum about once a day. (*Id.*)  Plaintiff stated that a lot of times, she does not go out at all, such as when it is very windy. (*Id.*)  She explained that she got sick the last time she went outside in the cold and rain, and she does not go out because

///

she does not want to get sick afterward. (*Id.*) Plaintiff stated that she tries to go outside every other day "to get some sun." (*Id.*)

When Plaintiff is exposed to dust, smoke, or fumes now, she gets fatigued and might start coughing. (AR 63-64.) Plaintiff explained that she "cannot deal with cigarette smoke period." (AR 64.) She tries to avoid construction sites, and if she has to pass by one, she puts on a mask immediately. (*Id.*) Plaintiff wears a mask in any environmental area that she thinks might cause her harm. (AR 71.) Plaintiff uses an inhaler twice a day, as directed by her treating doctor. (AR 64.)

Plaintiff asserted that she disagreed with the examining doctor's report from February 11, 2016 because "[t]here was a lot of incorrect information . . . especially regarding no limitation." (AR 66.) She noted that the report did not record her use of arch supports, and she disputed the functional limitations, including the sitting and standing limitations. (*See* AR 67-68.) Plaintiff stated that she can sit for one or two hours at a time, and after 30 minutes, she likes to get up and move around. (AR 68.)

## 2.    Applicable Legal Standards

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036) (internal quotation marks omitted). If so, and if the ALJ does not find evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting a claimant's testimony regarding the severity of his symptoms. *Id*. The ALJ must identify what testimony was found not credible and explain what evidence undermines that testimony. *Holohan v.*

*Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). "General findings are insufficient." *Lester*, 81 F.3d at 834.

### 3. Discussion

"After careful consideration of the evidence," the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 30.) The ALJ relied on the following reasons: (1) lack of supporting objective medical evidence; (2) routine and conservative treatment; (3) activities of daily living; and (4) inconsistent statements. (*See* AR 30-33.) No malingering allegation was made, and therefore the ALJ's reasons must be "clear and convincing."

### a. Reason No. 1: Lack of Supporting Objective Medical Evidence

The lack of supporting objective medical evidence cannot form the sole basis for discounting testimony, but it is a factor that the ALJ may consider in making a credibility determination. *Burch*, 400 F.3d at 681; *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).

With respect to Plaintiff's pulmonary issues, the ALJ observed that Plaintiff complained of cough, difficulty breathing, fatigue, headache, and eye irritation in May 2008. (AR 30; *see* AR 297.) Upon examination, Plaintiff had clear lungs and pulmonary function testing consistent with moderate obstruction with significant reversibility, consistent with asthma. (AR 298.) Allergy testing indicated mild allergies to dust mites, cockroaches, and mold. (*Id.*) It was recommended that Plaintiff begin medication to control her asthma symptoms. (*Id.*)

In September 2009, a physician reviewed Plaintiff's medical records and determined that there was evidence of a moderate obstructive defect with a significant bronchodilator response, consistent with a diagnosis of asthma. (AR

12

612.)  Plaintiff's diagnosis of asthma was noted as "100% industrially related," caused by "something within the trailer" where Plaintiff had worked.  (*Id.*)

In March 2010, Plaintiff's asthma was controlled when away from exposure.  (AR 439.)  The ALJ found that this was not indicative of the severity levels alleged by Plaintiff.  (AR 31.)  The ALJ also noted that Plaintiff was stable in June 2010 and she indicated that she wanted to return to work.  (*Id.*; *see* AR 442.)

Upon examination in January 2011, Plaintiff's symptoms were overall at baseline and fairly well controlled with medication.  (AR 452.)  No respiratory abnormalities were noted.  (AR 453.)  The ALJ determined that these findings were inconsistent with Plaintiff's allegations because it was highly unlikely that Plaintiff would be assessed as stabled with controlled symptoms if her impairments were as severe as she alleges.  (AR 31.)

The ALJ observed similar treatment notes throughout the record.  (*Id.*)  No lung issues were noted during a May 2011 examination.  (AR 310.)  Also in May 2011, Plaintiff's treating doctor noted that Plaintiff's "symptoms are mainly resolved," and Plaintiff denied respiratory problems aside from an occasional cough.  (AR 455.)  In April 2012, Plaintiff was "feeling overall stable," and no issues were noted upon examination.  (AR 470-72.)  Plaintiff also had normal pulmonary findings in August 2012.  (AR 328.)

In January 2013, Plaintiff sought treatment for a cough.  (AR 351.)  Plaintiff had normal breath sounds, no respiratory distress, no shortness of breath, and no wheezing.  (AR 351-52.)  Plaintiff was diagnosed with an upper respiratory infection with no signs of pneumonia.  (AR 352.)  In February 2013, Plaintiff had "mostly controlled symptoms" and no other complaints.  (AR 480.)

Plaintiff had no respiratory issues at a medical visit in October 2013.  (AR 379.)  In November 2013, Plaintiff complained of cold symptoms and a two-day cough that was worse at night.  (AR 404.)  Plaintiff again had normal breath sounds, no respiratory distress, no shortness of breath, and no wheezing.  (AR 405.)

Her cough was noted as being secondary to a viral infection, and she was prescribed a cough syrup. (AR 406.) No respiratory issues were noted in January 2014. (*See* AR 414.)

The ALJ observed that in March 2014, "roughly around the time of [Plaintiff's] application date," Plaintiff again complained of fatigue and respiratory issues. (AR 31; *see* AR 502.) The ALJ stated that it "is odd that [Plaintiff] would suddenly start experiencing more severe symptoms around the date of her application despite alleging, in the application itself, that she had been unable to work for many years prior to that point." (AR 31.) Upon examination in June 2014, no severe respiratory issues were noted, and Plaintiff's treatment remained the same. (AR 517.)

The ALJ determined that the record regarding Plaintiff's pulmonary issues "is not indicative of an individual limited to the extent [Plaintiff] alleges prior to [her] date last insured," as Plaintiff's symptoms were routinely noted to be stabled and controlled. (AR 31.) The ALJ also observed that objective findings indicated few ongoing problems after Plaintiff was removed from the location where irritants were located. (AR 31-32.) Finally, the ALJ noted that Plaintiff's records after her date last insured, including a physical consultative examination, did not support the severity of her allegations. (*See* AR 32-33.)

With respect to Plaintiff's plantar fasciitis, the ALJ noted that the record does not contain objective evidence to support the extent of Plaintiff's allegations. (AR 32.) In fact, the ALJ observed that the record contains little mention of any issues with Plaintiff's lower extremities. (*Id.*) No issues were noted in May 2008, March 2010, or June 2010. (AR 298, 440, 443, 457.) Plaintiff was also noted to be ambulatory in September 2011. (AR 461.) In August 2012, after being in a motor vehicle accident, Plaintiff made no musculoskeletal complaints and had normal range of motion. (AR 328.) In January 2013, Plaintiff again had normal range of

///

14

motion.  (AR 352.)  Plaintiff denied any musculoskeletal issues, and she had no abnormalities and a normal gait in May 2013.  (AR 486-87.)

In March 2014, Plaintiff complained of bilateral heel pain for the prior 3 to 4 years, with pain that began in the morning but lessened throughout the day.  (AR 422.)  Minimal point tenderness was observed over the inferior aspect of the bilateral heel, without masses, deformity, or edema.  (*Id.*)  No other foot or ankle abnormalities were noted.  (*Id.*)  Plaintiff was diagnosed with plantar fasciitis.  (AR 302, 422.)

The ALJ also noted that records following Plaintiff's date last insured, including a physical consultative examination, do not support the severity of Plaintiff's allegations regarding her plantar fasciitis.  (*See* AR 33.)

Overall, the ALJ determined that "[t]he longitudinal treatment and objective findings contained within the record are not consistent with [Plaintiff's] alleged level of limitation."  (AR 30.)  Although Plaintiff's treatment records may be interpreted in more than one way, the evidence can rationally support the ALJ's determination.  Accordingly, the Court should uphold her interpretation of the evidence.  *See Ryan*, 528 F.3d at 1198; *Robbins*, 466 F.3d at 882.

### b.      Reason No. 2: Routine and Conservative Treatment

An ALJ may discount a claimant's credibility based on routine and conservative treatment.  *See Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."); *see also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (rejecting a plaintiff's complaint "that she experienced pain approaching the highest level imaginable" as "inconsistent with the 'minimal, conservative treatment' that she received").

Plaintiff was diagnosed with bilateral plantar fasciitis in March 2014, and she was directed to engage in stretching exercises, take anti-inflammatory medications, apply cold packs, and use arch supports.  (AR 302-03, 422.)  In August 2014,

Plaintiff was instructed to ice her foot for 10 minutes at a time, three times a day. (AR 514.) She was alternatively instructed to try massage, acupressure, or acupuncture. (*Id.*) The ALJ stated that these conservative treatments "are not indicative of the severity alleged by the claimant." (AR 32.) The ALJ determined that if Plaintiff were limited to the extent that she alleged, then much more aggressive treatment would be expected. (*Id.*)

Because Plaintiff's treatment consisted of a conservative treatment plan, the ALJ permissibly discounted Plaintiff's credibility with respect to her plantar fasciitis. *See Parra*, 481 F.3d at 751 ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995))).

The Court finds that this reason is a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's credibility.

### c.    Reason No. 3: Activities of Daily Living

As part of the credibility determination, the ALJ may consider inconsistencies between the claimant's testimony and his or her daily activities. *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). Inconsistencies between symptom allegations and daily activities may act as a clear and convincing reason to discount a claimant's credibility. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). But a claimant need not be utterly incapacitated to obtain benefits. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999); *accord Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

///

Plaintiff contends that the ALJ erred in discounting her credibility based on simple activities of daily living such as driving and shopping, which do not trigger asthma or require sustained standing or balance. (JS 27.) But Plaintiff cites the ALJ's discussion of Plaintiff's activities in the context of determining that Plaintiff's depression and anxiety were non-severe. (*Id.*; *see* AR 27.)

When assessing Plaintiff's credibility, the ALJ observed that in May 2011, well after Plaintiff's AOD of May 20, 2008, Plaintiff was noted to have engaged in a lot of lifting and martial arts in the prior year. (AR 33; *see* AR 309.) The ALJ found that the ability to participate in these activities "is not indicative of an individual limited to the extent alleged" by Plaintiff. (AR 33.) The ALJ further opined that it is "highly unlikely" that Plaintiff would be able to engage in these activities if she could stand for only 10 minutes and walk for 30 minutes. (*Id.*) Furthermore, the ALJ also noted that the record reflected that Plaintiff engaged in moderate to strenuous exercise multiple times per week during the alleged period of disability. (*Id.*; *see* AR 315 (30 to 120 minutes of moderate to strenuous exercise 7 days per week in May 2011); AR 346 (10 minutes of moderate to strenuous exercise 5 days per week in August 2012); AR 350 ("exercises 40 minutes 7 days per week at a moderate or strenuous level" in January 2013); AR 369 ("exercises 20 minutes 7 days per week at a moderate to strenuous level" in May 2013); AR 452 (exercises 5 times a week in January 2011).)

The ALJ therefore determined that these activities were inconsistent with the degree of severity alleged (AR 33), and she properly discounted Plaintiff's testimony on this basis. *See Molina*, 674 F.3d at 1112 (the ALJ may consider "whether the claimant engages in daily activities inconsistent with the alleged symptoms" (quoting *Lingenfelter*, 504 F.3d at 1040)); *see also Rollins*, 261 F.3d at 857 (affirming an ALJ's adverse credibility determination, despite "equivocal" testimony about how regularly the claimant engaged in her activities, because the ALJ's interpretation was reasonable).

The Court finds that this reason is a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's credibility.

### d. Reason No. 4: Inconsistent Statements

The ALJ may also consider inconsistencies between the claimant's testimony and her other statements. *See Light*, 119 F.3d at 792; *Tonapetyan*, 242 F.3d at 1148.

The ALJ noted that on two occasions during the alleged period of disability, Plaintiff indicated that she wanted to return to work. (AR 33; *see* AR 442 (June 23, 2010); AR 447 (Sept. 29, 2010).) The ALJ determined that such statements "seem to suggest that the claimant did not believe herself to be incapable of work, as she now alleges." (AR 33; *see* AR 31.) The ALJ also noted that Plaintiff testified that she tried to go back to her previous position after being transferred. (AR 33.)

Although Plaintiff argues that her desire to work should not detract from her credibility (*see* JS 27), the ALJ was permitted to rely on the inconsistency between Plaintiff's statements and her allegations of being unable to work due to disability. *See Merritt v. Colvin*, 572 F. App'x 468, 470 (9th Cir. 2014) (affirming an ALJ's finding that a claimant's "interest in starting a new job is not consistent with [the] marked limitations in the ability to tolerate work pressures" about which the claimant testified); *Fregoso v. Astrue*, No. CV 11-9497 JC, 2012 WL 2195655, at *4 (C.D. Cal. June 14, 2012) ("[P]laintiff's testimony at the hearing that she had been looking for work was inconsistent with plaintiff's assertions that she suffers from disabling impairments which preclude her from working at all."), *aff'd* (9th Cir. Aug. 13, 2013); *see also Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) ("[The ALJ] is entitled to draw inferences logically flowing from the evidence.").

The Court finds that this reason is a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's credibility.

///

///

### C.    <u>The ALJ Properly Considered the Medical Opinions and Evidence</u>

Plaintiff contends that the ALJ improperly weighed the opinion evidence and objective medical evidence, instead "simply disagree[ing] without sufficient specificity with the treating doctors' assessments." (JS 18-19.)  The Commissioner contends that the ALJ provided legally sufficient reasons for discounting medical opinions and properly considered the objective evidence.  (*See* JS 19-26.)

#### 1.    **Applicable Legal Standard**

The ALJ is responsible for assessing a claimant's RFC "based on all of the relevant medical and other evidence." 20 CFR §§ 404.1545(a)(3), 404.1546(c); *see Robbins*, 466 F.3d at 883 (citing Soc. Sec. Ruling 96-8p, 1996 WL 374184 (July 2, 1996), at *5).  In doing so, the ALJ may consider any statements provided by medical sources, including statements that are not based on formal medical examinations.  *See* 20 CFR §§ 404.1513(a), 404.1545(a)(3).

Courts give varying degrees of deference to medical opinions based on the provider: (1) treating physicians who examine and treat; (2) examining physicians who examine, but do not treat; and (3) non-examining physicians who do not examine or treat.  *Valentine v. Comm'r, Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).  Most often, the opinion of a treating physician is given greater weight than the opinion of a non-treating physician, and the opinion of an examining physician is given greater weight than the opinion of a non-examining physician. *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

The ALJ must provide "clear and convincing" reasons to reject the ultimate conclusions of a treating or examining physician.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988); *Lester*, 81 F.3d at 830-31.  When a treating or examining physician's opinion is contradicted by another opinion, the ALJ may reject it only by providing specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F.3d at 633; *Lester*, 81 F.3d at 830; *Carmickle v. Comm'r,*

*Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings.'" *Garrison*, 759 F.3d at 1012 (citation omitted). A non-examining physician's opinion can constitute substantial evidence if it is supported by other evidence in the record and is consistent with it. *Morgan*, 169 F.3d at 600.

### 2. Discussion

#### a. Listed Impairment

At step two, an ALJ must determine whether a claimant has an impairment or combination of impairments that meet or medically equal the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. 20 CFR 404.1594(f)(2). Listed impairments are "designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S. Ct. 885, 892, 107 L. Ed. 2d 967 (1990). To show that a claimant's impairment meets a listing, the claimant must meet all of the specified medical criteria for that listing. *Id.* at 530.

Dr. Ishaaya began treating Plaintiff for her pulmonary issues in May 2008. (*See* AR 297.) He diagnosed Plaintiff with mild allergies to dust mites, cockroaches, and mold, as well as asthma, which was noted as likely developing in response to a new work environment. (AR 298.) In September 2010, Dr. Ishaaya stated that Plaintiff could return to work if she avoided "triggers." (AR 449.) Plaintiff contends that because Dr. Ishaaya "saw Plaintiff in the Workers Compensation setting, his opinion centered on the trailer as a casual work environment, as opposed to the respiratory 'triggers' present during everyday inspections of a construction site." (JS 15-16.) In January 2011, Dr. Ishaaya recommended that Plaintiff continue using her medications and inhaler, and he suggested pulmonary function testing if Plaintiff's symptoms did not improve. (AR 454.) In September 2011, Dr. Ishaaya noted that Plaintiff could return to work if

she avoided chemicals or unclean environments.  (AR 463.)  Plaintiff continued to have similar symptoms, which Dr. Ishaaya noted as being "mostly controlled." (*See* AR 480.)  In March 2014, Dr. Ishaaya indicated that Plaintiff would need to avoid chemicals, dust, and fumes, and she would otherwise need a mask while at work.  (AR 503.)  Dr. Ishaaya noted Plaintiff's "lack of improvement" in May 2014.  (AR 488.)

Plaintiff asserts that her history of treatment with Dr. Ishaaya "satisfies the requirement of Listing 3.03, that Plaintiff experience chronic bronchial spasm (cough) despite the prescribed treatment.  It also establishes longitudinal treatment."  (JS 16.)

Listing 3.03[4] for asthma requires a showing of either (A) chronic asthmatic bronchitis as evaluated under the criteria for chronic obstructive pulmonary disease in Listing 3.02A,[5] or (B) attacks, as defined in Listing 3.00C,[6] in spite of prescribed treatment and requiring physician intervention, occurring at least once every two months or at least six times a year.  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

The ALJ considered Listing 3.03 and found that the record did not show that Plaintiff experienced chronic bronchitis or attacks, in spite of prescribed treatment and requiring physician intervention, occurring at least once every two months or at least six times a year.  (AR 29.)  The ALJ further observed that no medical source indicated that Plaintiff medically equaled a listing.  (*Id.*)

As Plaintiff has not demonstrated that her "chronic bronchial spasm (cough)"

---

[4] The ALJ's decision is dated May 26, 2016.  (AR 36.)  The Court therefore cites the version of the Listings in effect from May 24, 2016 to August 2, 2016.

[5] This evaluation uses a table to determine whether a claimant's $FEV_1$ value and height satisfy the listing criteria.  *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (Listing 3.02A).

[6] "Attacks of asthma . . . as referred to in paragraph B of 3.03 . . . are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting."  20 C.F.R. § Pt. 404, Subpt. P, App. 1 (Listing 3.00C).

meets the criteria of Listing 3.02A, nor has she demonstrated that she suffered the requisite attacks as defined in Listing 3.00C, the ALJ did not err in finding that Plaintiff's asthma did not meet or medically equal Listing 3.03. *See Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995) (a claimant has the burden of demonstrating disability under the Listings).

### b.    Opinion of Abraham Ishaaya, M.D.

Dr. Ishaaya completed a Pulmonary Residual Functional Capacity Questionnaire in April 2016. (AR 659-62.) Dr. Ishaaya noted Plaintiff's asthma, allergies, shortness of breath, fatigue, coughing, and sinus congestion. (AR 659.) He assessed that Plaintiff could walk only one block, sit for one hour, and stand for 10 minutes at a time. (AR 661.) He also assessed that Plaintiff could stand or walk for less than 2 hours and sit for about 4 hours in an 8-hour workday. (*Id.*) Dr. Ishaaya indicated that Plaintiff could never climb ladders and rarely climb stairs, she should avoid all exposure to tobacco smoke, and she should avoid even moderate exposure to perfumes, solvents/cleaners, fumes, odors, gases, dust, and chemicals. (AR 661-62.)

The ALJ gave no weight to Dr. Ishaaya's opinion, finding that it was not supported by the totality of the record or even Dr. Ishaaya's own treatment notes, which showed stable and controlled symptoms.[7] (AR 34.) The ALJ properly rejected Dr. Ishaaya's opinion on this basis. *See Valentine*, 574 F.3d at 692-93 (finding that a contradiction between a physician's opinion and his own treatment notes is a specific and legitimate reason to reject that opinion); *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (an ALJ need not accept an opinion that is unsupported by clinical findings).

The ALJ determined that Dr. Ishaaya's opinion was clearly "little more than patient advocacy" (AR 34), which is also a permissible basis for discounting the

---

[7] Plaintiff acknowledges that her "chronic symptoms remained mild as long as she was not exposed to irritants or to any tobacco smoke." (JS 16.)

opinion. *See Saelee v. Chater*, 94 F.3d 520, 523 (9th Cir. 1996) (rejecting a physician's opinion that lacked an objective medical basis and instead appeared to advocate for a patient based on the patient's subjective allegations).

The ALJ also observed that Dr. Ishaaya's opinion was inconsistent with Plaintiff's acknowledged lifestyle, which included martial arts and frequent exercise. (AR 34.) Plaintiff contends that the evidence of her martial arts and exercise is ambiguous, and "the rational explanation" is that Plaintiff had been referring to doing Tai Chi and a few minutes of light weights. (*See* JS 17.) The ALJ had previously discussed Plaintiff's reports of frequent moderate to strenuous exercise—more than just Plaintiff's May 2011 notation of "a lot of lifting/martial arts" in the prior year. (AR 33.) It is the duty of the ALJ to resolve conflicts in the evidence, and her interpretation of Plaintiff's activities is a reasonable one. *See Tommasetti*, 533 F.3d at 1041 ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."); *see also Ryan*, 528 F.3d at 1198 (an ALJ's decision should be upheld "[w]here evidence is susceptible to more than one rational interpretation"). Accordingly, the Court finds that this too is a valid reason for rejecting Dr. Ishaaya's opinion. *Morgan*, 169 F.3d at 602 (rejecting a medical opinion based, in part, on its inconsistency with the claimant's demonstrated abilities).

The ALJ noted that Dr. Ishaaya's April 2016 opinion was dated long after September 30, 2014, Plaintiff's date last insured, and the opinion "is not indicative of her functioning during the period in question." (AR 35.) Indeed, when asked to state the earliest date that these limitations apply, Dr. Ishaaya failed to provide a date. (AR 662.) This is another valid reason for rejecting Dr. Ishaaya's opinion. *See Watkins v. Astrue*, 357 F. App'x 784, 786 (9th Cir. 2009) (affirming the rejection of a 2005 medical opinion that was written in the present tense and did not indicate that the opinion referred to the claimant's limitations in 2003).

In March 2014, Dr. Ishaaya opined that Plaintiff "would have difficulty

returning to full time work due to persistent symptoms." (AR 296.) The ALJ stated that this is a determination for the Commissioner. (AR 35.) Although the determination of a claimant's ultimate disability is reserved to the Commissioner, *see* 20 CFR § 404.1527(e)(1), the ALJ must give legally adequate reasons for rejecting a treating physician's opinion that Plaintiff cannot work. *See McAllister v. Sulliva*n, 888 F.2d 599, 602-03 (9th Cir. 1989) (finding remand warranted where an ALJ failed to give specific and legitimate reasons for disregarding a treating physician's testimony that claimant was "fully disabled for employment"). The ALJ further found that this determination is not supported by the record or Dr. Ishaaya's own treatment notes. (AR 35.) As previously discussed, the lack of support for an opinion is a proper reason to reject it. *See Valentine*, 574 F.3d at 692-93; *Matney*, 981 F.2d at 1019.

Finally, the ALJ noted that Dr. Ishaaya opined that Plaintiff would need to wear a mask at work, but there was no indication that the mask was necessary as long as Plaintiff stays away from irritants as set forth in the RFC. (AR 35.) Plaintiff seemingly does not dispute this statement. (*See* JS 17.)

In sum, the ALJ properly considered and rejected Dr. Ishaaya's opinion with specific and legitimate reasons supported by substantial evidence.

### c.      Opinion of Robert F. Meth, M.D.

Dr. Meth evaluated Plaintiff on February 3, 2009. (AR 615-32.) He observed that Plaintiff's asthma "appears to be industrially related" and was caused or aggravated by something within her workplace trailer. (AR 631.) Dr. Meth recommended that Plaintiff be restricted from working in that trailer and that she be placed in a clean office building without significant exposure to dust or fumes. (*Id.*) Dr. Meth also reviewed Plaintiff's medical records later that month. (AR 605-07.) He assessed that Plaintiff had a 17% impairment of the whole person. (AR 607.)

In March 2009, Dr. Meth reviewed Plaintiff's May to June 2008 medical

records from Dr. Ishaaya. (AR 608-10.) Dr. Meth determined that these records did not change his opinions from his February 2009 reports. (AR 609.) He noted the "essentially negative" allergy tests and mild findings from pulmonary function tests. (*Id.*) Dr. Meth also observed that more recent February 2009 pulmonary function tests "were definitely improved" from the May 2008 tests. (*Id.*)

Dr. Meth reviewed Plaintiff's updated medical records in September 2009. (AR 611-13.) He then assessed that Plaintiff had a 25% impairment of the whole person and again opined that her asthma "appears to be industrially related," caused by something within her workplace trailer. (AR 613.)

The ALJ gave Dr. Meth's opinions no weight because the "impairment of the whole person" ratings "cannot properly be translated into limitations usable in assessing [Plaintiff's] functional abilities." (AR 35.) The ALJ noted that Dr. Meth evaluated Plaintiff for workers' compensation purposes, which "likely utilizes different criteria than those used by the Social Security Administration." (*Id.*)

Plaintiff contends that the ALJ "failed to at least attempt to translate medical opinions using state workers' compensation terminology into the corresponding Social Security parlance." (JS 15.) An ALJ errs when she does not adequately consider the distinction between Social Security and workers' compensation terminology. *See Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). The ALJ's decision "need not contain an explicit 'translation,'" but it should indicate that the ALJ recognized the differences in terminology and took those differences into account in the evaluation. *Booth v. Barnhart*, 181 F. Supp. 2d 1099, 1106 (C.D. Cal. 2002); *see Rivera v. Colvin*, No. CV 14 -09217-KS, 2016 WL 94231, at *4 (C.D. Cal. Jan. 7, 2016) (finding that an ALJ satisfied the obligation to recognize the difference in terminology by noting that "these determinations were made using criteria based upon rules of another agency"). Here, the ALJ recognized that the "impairment of the whole person" ratings could not be translated into limitations that were usable for assessing functional abilities.

25

(AR 35.)

Moreover, the ALJ also observed that examinations performed on later dates, "as discussed in detail above," indicated that Plaintiff had few respiratory issues. (*Id.*) This is an additional valid reason for rejecting Dr. Meth's opinion. *See Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998) ("The Commissioner may reject the opinion of a non-examining[8] physician by reference to specific evidence in the medical record.").

### d. Evidence of Plantar Fasciitis

Plaintiff notes that she was diagnosed with bilateral plantar fasciitis in March 2014, and she indicated that the pain began three to four years earlier. (JS 18; *see* AR 302, 422.) She acknowledged that a consultative examiner provided no limitations on climbing and balancing, but she notes that the examining doctor "apparently made no inquiry into Plaintiff's past work." (JS 18; *see* AR 640.)

The ALJ thoroughly considered Plaintiff's medical records, and she found that the record lacked objective evidence to support the extent of Plaintiff's allegations. (AR 32.) Although Plaintiff refers to Dr. Ishaaya's opinion and Plaintiff's testimony at the hearing, the ALJ properly rejected this evidence, as previously discussed. Plaintiff identifies no other basis for error.

The Court therefore finds that the ALJ did not err in failing to include additional RFC limitations related to Plaintiff's plantar fasciitis. *See Arrieta v. Astrue*, 301 F. App'x 713, 715 (9th Cir. 2008) (finding that substantial evidence supported the RFC determination when the ALJ properly evaluated the opinion evidence and relied on supporting medical evidence).

---

[8] Although Dr. Meth did examine Plaintiff on February 3, 2009, his opinions regarding Plaintiff's "impairment of the whole person" rating were based on his February 19, 2009 review of Plaintiff's February 9, 2009 test results, as well as his September 3, 2009 review of Plaintiff's August 25, 2009 test results. (*See* AR 606-07, 612-13.) These opinions were not based on his personal examination of Plaintiff.

*///*

### e.    Limitations Related to Anxiety and Depression

Finally, Plaintiff argues that the ALJ improperly ignored the impact of her anxiety and depression.  (JS 18.)  Plaintiff notes that a workers' compensation examiner limited her psychological work restrictions to preclude her from returning to her work trailer because that was the limited workers' compensation issue.  (*Id.*) Plaintiff also asserts that the psychological consultative exam led to a finding of only moderate psychosocial stressors due to the cursory nature of the examination. (*Id.*)  Plaintiff contends that her testimony demonstrates her anxiety about the future and her fears regarding exposure to environmental irritants, exertional challenges, and potential injury.  (*Id.*)

When a claimant alleges there is a mental impairment that prevents her from working, the Social Security Administration supplements the five-step sequential evaluation process with additional inquiries.  *See Maier v. Comm'r of Soc. Sec. Admin.*, 154 F.3d 913, 914-15 (9th Cir. 1998) (per curiam) (citing 20 C.F.R. § 416.920a).  First, the ALJ must evaluate a claimant's symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. If such an impairment is found, the information that substantiates the presence of the impairment must be documented in the ALJ's decision.  20 C.F.R. § 416.920a(b)(1), (e)(4).  Next, the ALJ must rate the degree of the claimant's functional limitation resulting from the impairment in four broad functional areas and record it.  *See* 20 C.F.R. § 416.920a(b)(2), (c)(3), (e)(4). The four areas are (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decomposition.    20   C.F.R. § 416.920a(c)(3).[9]   The first three functional areas are to be rated on a five-point

_____

[9] This section was amended as of January 17, 2017.  Because the ALJ's decision is dated May 26, 2016, the Court refers to the prior version of 20 C.F.R. § 416.920a(c)(3), which the ALJ used in her analysis.

scale of "none," "mild," "moderate," "marked," and "extreme." 20 C.F.R. § 416.920a(c)(4). The fourth area is to be rated on a four-point scale of "none," "one or two," "three," and "four or more." *Id.* After rating the degree of functional limitation resulting from a claimant's impairment, the ALJ must then determine the severity of the claimant's mental impairments. 20 C.F.R. § 416.920a(d). If the claimant's degree of limitation in the first three functional areas is "none" or "mild" and "none" in the fourth area, the ALJ may generally conclude that a claimant's impairment is not severe unless evidence indicates that the claimant has more than a minimal limitation in his ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1).

At step two, the ALJ found that Plaintiff's medically determinable mental impairments of depression and anxiety, "considered singly and in combination, do not cause more than minimal limitation" in Plaintiff's ability to perform basic work activities and, therefore, are not severe. (AR 27.) The ALJ found that Plaintiff had no limitations in activities of daily living; social functioning; or concentration, persistence, or pace. (*Id.*) The ALJ also found that Plaintiff had experienced no episodes of decompensation of extended duration. (AR 28.)

Additionally, the ALJ thoroughly discussed Plaintiff's medical records, which did not show anything more than mild symptoms. (AR 28.) The ALJ also noted that Plaintiff denied severe psychiatric symptoms on many occasions. (AR 28; *see* AR 456, 462, 466, 471, 477, 567, 506.) Although Plaintiff was assessed as having anxiety in August 2012 and was encouraged to receive treatment, the ALJ observed that there was no indication that Plaintiff engaged in extended mental health treatment after that. (AR 28; *see* 339, 341.) The ALJ determined that, as a whole, the record demonstrated that Plaintiff did not have a mental impairment that was so severe that it limited her ability to work. (AR 29.)

Because the ALJ found that Plaintiff's medically determinable mental impairments caused no more than "mild" limitations with no episodes of

decompensation, the ALJ properly concluded that Plaintiff's mental impairments are non-severe. (AR 28.)

To the extent that Plaintiff contests the RFC's failure to include limitations related to her depression and anxiety, Plaintiff appears to rely only on her subjective testimony to establish her need for limitations. (*See* JS 18.) As discussed above, the ALJ properly discounted Plaintiff's credibility, and thus the ALJ was not required to include limitations arising solely from these discredited symptom allegations. *See* 20 CFR §§ 404.1545(a)(3), 404.1546(c) (the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence").

## V. CONCLUSION

IT IS ORDERED that Judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: October 31, 2018

_____
ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

## NOTICE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS/NEXIS, OR ANY OTHER LEGAL DATABASE.**